I may please the court Devin Burstein on behalf of Mr. Shultz with me with me at council table Mr. Scott for Mr. Haymore and Miss Farentino for Miss Malconian I'll be addressing severance as well as Shultz sentencing issue Mr. Scott will be addressing the PowerPoint and this conduct argument and Miss Farentino is available for any questions about Miss Malconian case specifically but will not otherwise so Miss Farentino's not going to argue unless we have questions that's correct your honor I see okay go ahead thank you turning to severance using the defendants against each other the government's closing argument described the trial as follows they're all pointing the finger at each other and Shultz Shultz seems to be the defense team on that side is pointing over to Mr. Haymore and Mr. Haymore side is pointing back at Mr. Shultz your honors that description is accurate but it vastly understates the conflict here in the words of one of the defense lawyers Mr. Burstein you know before you get to the merits of your severance argument the government contends you waived it you know right you want to address waiver certainly your honor Mr. Shultz in particular but I suppose it doesn't really matter because if it's severed it's severed but that's our argument so this idea of waiver is not as we say in the briefs this gotcha game designed to punish criminal defendants the whole point of preservation is was this issue raised for the district court so that the district court had an opportunity let me give you my impression about this one at least initially because I've read most of the opening closing arguments and my impression is that at the point of the opening argument ie at the point which presumably reflects what the district court knew at the time these motions were originally made that the government's description of the way the parties were situated was pretty accurate actually kind of surprised me in a sense that the their main description their briefs is that everybody was really pointing at the other two at the point of the closing argument it that seemed to have changed a great deal so the problem for you it seems to me is that there was what happened at the trial and in the closing arguments seems quite arguably to have changed the way that the district court could have made a different decision that it made the first time it wasn't given a chance there's two responses to that first let's talk about I think what happened before trial because if you look your honor at er 406 this was specifically described exactly what was happened would foreshadow not the way the government portrayed it and I'll quote the CRS defendants that is the California contingent the Schultz camp will engage in a defense that is mutually inconsistent with the defense of Hamer and vice versa the parties have already stated in their testimonial inferences with the FBI their inconsistent defenses particularly relating to the PowerPoint reference in the in the indictment the party's defenses will be so antagonistic and inconsistent that CRS will become a second prosecutor to Hamer and Hamer will become a second prosecutor to CRS and Schultz that's 406 that your honor is exactly what happened and that is pretrial on May 5th 2013 but still pretrial you know the judge I think was pretty open about I think is somewhat ambiguous feelings right if you know and said it was could change during trial but I understand that point your honor but this was that it's not that he was not foreshadowed the judge was told exactly what would happen we can continue and if we look at er 421 again but the point is the judge didn't buy it and the judge basically telegraphed that this should be brought up again if something changed so what what's what's the problem I wouldn't why wouldn't it be brought up again it's a pretty easy rule to comply with that would have been best practice but it's not a waiver requirement in the sense that we now are precluded from raising this issue on appellate review I agree it's a it could have done but in the middle of a six-week trial trial lawyers can you know maybe they don't raise it the first time so why is it not precluded is really gets to the question well there's there's multiple answers to that question first of all rule 14 says it has to be raised ahead of trial now we have this judicially created renewal requirement but that renewal requirement has multiple exceptions each of those exceptions applies here and the renewal requirement in and of itself which starts in 1953 and in the Finley case in the I believe a circuit has to do with exactly what didn't happen here when somebody moves for severance based on misjoinder and then they change the idea of why severance is required on appeal you need to renew it during trial Williamson is the first case from the Ninth Circuit that adopts that 8th Circuit rule common sense it's 19 I believe 62 and they say when it essentially appears in trial but let's just say the court disagrees with that and says it should have been renewed well I would point the court to the Vasquez Velasco case and what Vasquez Velasco says is although he did not move for severance at the end of trial to require the defendant to move for severance on the same grounds for which several of his emotions had already been denied would be an unnecessary formality to coud this court's case makes the same point even if renewal is required they say quote a defendant will not be found to have waived his challenge if he can show either that he diligently pursued severance or that renewing the motion would have been an unnecessary formality you say the same grounds though you started off your argument by pointing specifically at what the argument the government and closing argument says this guy's pointing the finger at this guy this guy's pointing the finger back at that guy before trial the government wasn't saying that so so something did change I mean and you highlighted it by the way you started off your argument I started off my argument saying even the government described the inconsistency in the defenses but it but when it was argued before trial the government was saying oh yeah it's inconsistent we're gonna argue they all pointed the finger at eaters that's that's not what they argued the government argued that we're all pointing the finger at somebody else well and the government was able that's true and the government was able to use the inconsistencies to advantage and that's exactly what was raised that's the problem that was raised by Hamer and in in his motion saying they'll become second prosecutors sorry your honor get off the labor for a minute how what from Schultz's point of I don't really I understand that the defense was I essentially did what they told me to do but I don't understand why that's a defense because it may be an emotional defense no no I mean it purports to be an intent defense I understand that correct but it was the fact that he did the PowerPoint that they gave him although not exactly as they gave it to him and it doesn't seem all that relevant to me except as I say in kind of a an emotional appeal as a jury to the question of whether he thought that all of this was on the up and up so I take your honor's point and it does go to intent and I I'd like to how it would go so if let's just pause it that the Haymore camp comes up with the scheme and they hire something they hire somebody to make these presentations and they tell the person what to say in the presentations and they tell him this is all true which is essentially what Schultz's witness testified happened mr. Ramirez who said that mr. Ramirez at it's the Schultz's defense case witness who says we went to Florida we had these meetings they told us they would be responsible for X they would be responsible for Y if that's the case if you are hired to give a pitch that you are told is true and in good faith you make that pitch you do not have the necessary intent to commit fraud because you're not intending to misrepresent anything that's the essence of the Schultz defense they gave me this PowerPoint they said they've been doing this for all these years and I trusted that that's what they were doing but in fact what they gave him was different than what he put on he would in ways that seem material to whether it's true or not I mean for example whether or not these properties were going to be rehabbed at at their costs before they were given to these people he would argue that it was not in ways that I mean his argument the defense the Schultz camp argument our argument is that it would not be material in those ways and that he was told that there would be sufficient money and that the Haymore the Florida contingent was responsible for all of those things now that I don't want to relitigate in the sense of that that whether that defense was the best possible defense but that was the defense and that defense had the legs I wouldn't just say cut out I would say smashed out by the accusations and the evidence put on and then the closing argument of the Florida contingent you see insofar as you're complaining about evidence one has to assume the same evidence would have come in on an individual case that and I wanted to go right there your honor because there's a lot of ways we can think about the prejudice from Joinder here one way is we can go chronologically through the trial but I think it's much more effective to talk about first prosecutor evidence second prosecutor evidence and closing argument and if you'll allow me to unpack that first prosecutor evidence what I mean is evidence that would not have existed in severed trials or evidence that it was not simply reiterating government arguments but it was new evidence it was the evidence that came specifically from the defense in this case let's start with evidence that came specifically or arguments from the Haymore side that the government wasn't making what how did Haymore act as a first prosecutor towards Schultz well it started in the very opening statements when the lawyers on the Florida contingent the Haymore camp say that as soon as they heard Schultz presentation they didn't want anything to do with him that's not something the government brought out and the only reason to say that is hey we're not guilty once we heard what Schultz was saying we ran for the hills then there's more the government focused on the alleged Schultz misrepresentations at these seminars but not the Haymore camp they went out of their way to talk about him personally and to make him seem as a liar writ large they went way beyond what the government with Donald Long for example they talk about this allegation that he said he managed nine billion dollar hedge fund that's comes from the totally irrelevant whether he was rude and mean to this alleged victim on the phone that doesn't come from the government that's supposedly a co defendant with mr. Ramirez he even says Haymore's lawyer says I want to ask you questions about him personally and then he goes to a litany and by the end the judge is incredulous how can you ask that question the judge says the answer that's a rhetorical question by the judge the answer of course is because Haymore is doing everything he can to make Schultz seem like a liar and a he used his own witness Corey Cooper to blame the Schultz side and then it continues into closing argument just to quote that I mean the idea that this could come from a co-defendant this stopped me in my tracks reading it in the immortal words of one mr. Eichmann I did it because I was told to do it the reference being to killing people in a distant war a long time ago that is the defense that has been presented by mr. Schultz and then mr. Lacoste lawyer also follows up on that takes no more innuendo what Schultz tried quoting what Schultz tried to do was take an extra 10,000 or 20,000 that should go for rehab and put it in his pocket so he could go ahead and cheat people including us he's specifically blaming him he says deceit came from Schultz mr. Schultz participated in the fraud we're not going to stand here with a straight face and say that those investors that you heard from they weren't cheated but it came from mr. Schultz mr. Schultz did what he did to get the money he didn't put the money into rehab mr. Schultz put the money in his pocket I mean at every stage of the game this was cross-attack it started lightly jabbingly in opening it was besieged more and more through the government's case with each government witness being used to reinforce the other side and then went to direct attack I mean your honor you're going to you're also going to hear from mr. Scott in a minute about the PowerPoint I mean that PowerPoint was given to the government through mr. Sotheby I don't understand what that meant you kept saying that I mean my understanding is that mr. Sotheby was the one who got the the forwarded PowerPoint and that's why he was the one who there's a second part your honor he was he admitted that he did that at behest of mr. Schultz did what at the behest turned it over to the government to throw the scent off of mr. Schultz and put it on to mr. Hamer turn it over to the government when before he turned it over to state investigators before during the investigation phase to say now obviously that's not a trial prejudice but I think it goes to the context and then in terms of the admissibility you'll I don't want to tread on my colleagues toes but you know that that is prejudice he will point to as coming from what wouldn't have happened in severed trials but I don't want to get away from the context what we're looking for is manifest prejudice the adversarial system is based on the government and I think we see that in the concurrence I'm not sure if it's justice Stevens but the concurrence is that what cases can you point to in which severance was determined to be was overturned a case was overturned a judgment on severance grant to tick Mayfield are two key ones Vasquez Velasco that I quoted you earlier I know to check which was and I mean basically there of the variety he shot him no she shot him that's not accurate your honor respectfully in both to tick and May pointing at the other defendant and the other defendant saying raising a different no raising a different defense and if I I think this is the government tries to portray this binary version of severance that doesn't exist where it's either this pure mutual exclusivity that your honor gave you know the knife in the back and two people going there was him right that's not what the cases say and we can see that tracing through Zafiro to Mayfield to to tick to Johnson to Sherlock and just I'd like to just go a little bit into this because it really is well then I will not go into it but just and ending ending here is that inconsistency to tick says alone seldom produces the type of prejudice that warrants reversal the probability of reversible prejudice increases as the defense move beyond inconsistent to the antagonistic mutual exclusivity may exist when only one defendant accuses the other and the other denies any involvement defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their co-defendant the existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the we have the attacks that the grotesque Nazi references that we saw throughout this trial would never fly that the blatant vouching would never fly coming from the other side this was not adversarial in the sense of a prosecutor versus the defendant this was the prosecutor versus defendant with the other defendant standing behind and punching in the head that's not a fair trial thank you very much thank you good afternoon your honors Tim Scott for the appellant Joseph Haymore I'm going to try to save a little bit of rebuttal time for Mr. Burstein to discuss sentencing an additional issue that applies to Mr. Haymore and to his partner and co-appellant Mr. Likazi is the admission of two key exhibits at trial exhibits that the government described as fraud blueprints factually these exhibits were a PowerPoint slideshow and a form contract respectively that the government asserted and that it's witness asserted went together that they were attached to one another and it was that attachment and the fact that they were supposedly linked to a certain email at a certain time given before a particular seminar that's what generated the meaning and what in the government's argument in view was so incriminating about them now it's our view that the admission of those two pieces of evidence violated both the confrontation clause the sixth amendment as well as the rules of amendment argument the the problem with admitting the PowerPoint as an amalgamated exhibit with the email was that it was tantamount to an implied assertion the the true sponsor of this evidence was Mr. Schultz was a person who was trying to place blame on Mr. Haymore and to sort of preemptively before even being charged start to build this defense that I was just a hired pitchman following this particular script that had been supplied to me factually Mr. Schultz fed this information to the third-party witness Sotheby was his name this was done in April of 20... What do you mean he fed it? I mean he forwarded it. Correct. In April of 2010 and... In April of 2010? I thought it was much earlier than that. No, April 2010 was when Schultz gave it to Sotheby and then Sotheby turned around... No, I'm sorry, your honor's correct. April 2010 was when Sotheby gave it to the government. Right. So that's absolutely correct. I misspoke. It was simultaneous essentially or close to simultaneous. I think it was sometime after. I think it was when Mr. Sotheby was concerned about the properties. There's no doubt that it was after the time that this alleged conspiracy was going on. There's no dispute that it was contemporaneous business documents. This was explicitly... I think this is the problem. What Sotheby authenticated was that this email essentially showed up on my computer and this is what it says. Right? And after what I got was this document. Isn't that all you have to do for authentication? If you're going to fight about whether... I mean you could say, well, to the jury, well how do we know it actually came from Haymor? But why does anything more than that require for authentication? Well, a couple responses to that. The first is that had he described it the way your honor just did, this is a thing that showed up in my inbox and was sort of agnostic about what it was or where it was from. And it said on it, it came from Haymor. But what he said is this is a document from Haymor to Schultz is the way that he described it. So he was sort of imputing that meaning to it that he wasn't in a position to describe. Now if we're just talking about... and I think this is sort of the spirit. That's a weight issue. I mean you could argue that he's not credible, but that doesn't affect... the fact that he says more than is necessary for the foundation doesn't mean that he hasn't said enough for the foundation. Well, so in terms of the weight argument, I think there's two responses. One is sort of what I described as a as a unit of measurement argument. And what I mean by that is it would be one thing if it was authenticating the email and then putting that in and then authenticating this PowerPoint slide and putting that in. Well wasn't the PowerPoint slide essentially authenticated by somebody else at the very end of the trial who said this was the PowerPoint that we in fact sent? There were various versions of the PowerPoint that any number of witnesses talked about. What was always missing was saying that this one that Schultz got was so similar to the one that he gave to the investors. And there's some statement that it was on the Haymor company's website. There were some of the statements on the website that were similar to some of the statements in the PowerPoint. But which is not to say that the PowerPoint itself or the verbatim language was the same. But what I was starting to talk about in terms of unit of measurement is the meaning and the relevance of that exhibit. And again, these are amalgamated exhibits. Putting them together is the link. And that's the damning part of it is claiming that they came together, that they were attached at the same time. As I said, if these were just separate exhibits and the and Mr. Schultz weren't claiming that they came together, it would be much less troubling evidence. But it's that link that's missing. Now, Mr. Sotheby, let's take him absolutely at his word and say that this is precisely what he got from Schultz and that that was exactly the PowerPoint that was attached to it. That's a lot different than saying that's what Mr. Haymor had attached to an email that he sent to Mr. Schultz. So it's a step removed. It's just a question of, you know, there's literally no proof that the email that Mr. Sotheby received had the same attachment on it. She could have argued to the jury. And in fact, I mean, the biggest problem is that the lawyer representing Mr. Haymor got up at the very beginning of the trial and said, yes, this PowerPoint was sent to Mr. Schultz by Mr. Haymor. I'm not denying that. And he said it again in the closing argument. And I thought you were very clever in your brief and tried to debunk that. But it's rather unusual to be standing here and arguing that this was an improper submission when you started with it and ended with it. In the way that he explains, I think this is at 73-31 in the ER, is he said to the district court, you know, I felt like I was stuck with it. I did my best to argue it based on the evidence. But he didn't just say, we don't really, you know, vouch for this thing. But, you know, assuming that, he stood up at the very beginning and said, of course, this was sent. Yeah. And this was after the government said the same thing in opening. So I guess the response to that is... So when he said it in opening, had it been pre-admitted in evidence or anything like that? Well, it was actually in the indictment. And it was also opened on in great detail. So in terms of him having to deal with something that was already in when he said it in opening, it wasn't already in it. It wasn't in evidence, at least at that point. Well, it wasn't in evidence. So, but I think that that's a double-edged sword in terms of the way the government wants to argue that. Because if it's, you know, if... Oh, but fair enough. It's just the way he said it, though, as Judge Berzon would say. Yeah, no, I understand. But so my point is, it wasn't in evidence, but him describing it is itself not evidence either, for the same reason that the government statement isn't, opening statement isn't evidence, neither is the attorney, you know, saying so in opening, and neither is the attorney. Can he ever actually object to a submission? Other than, in a motion to absent, is that it? But never again? No, it was vigorously objected to and argued throughout the case itself. Mr. Sotheby's testimony is at 29-28, I think is where the exact objection to it is, and there's lengthy sidebars and so forth. I'd like to address the government's rebuttal closing before I give the floor back, if I could do that briefly. The government's rebuttal argument does rise to the standard of plain error. There was an objection that was raised during rebuttal, but this court does have a robust body of plain error, misconduct in closing case law, and each one of the factors that this court has discussed exists in this case. First, it was in rebuttal. There was no chance for the defense to respond to the things that were said. This court has recognized in cases like Sanchez and that when the government saves these low blows for rebuttal, then that increases the likelihood that it's going to be significant to the jury. They were explicit references to personal experience and to experience in other cases. That's something that tips heavily against the government. As for Mr. Haymore, at least, it went to the heart of his defense. His defense was that this was an arm's length transaction with Schultz, who would had. There was a contract. And the government, in its brief, and this is at page 119 of the government's response brief, admits that that was the best evidence for the good faith defense, the existence of this contract and this third party dealing. This is page 119 of the government's response brief. The government acknowledges that what they were responding to was Haymore and Schultz's best argument and best evidence for their good faith. I don't understand why it's a good, I thought it was sort of a silly argument. Why is it a good argument? Well, the argument is, I think it's, part of its power comes from the fact that it's one step removed. So the contract he's describing is not the contract. You're talking about the contract between the two companies. Exactly. Between the vendor and the seller, Schultz, not with the end users. And the idea is because... It's a notion that if you were really thieves, you wouldn't have a contract because you couldn't enforce it, because it would be an illegal contract? What's the argument? I think the argument is that you don't go out of your way to document your own fraud. But you could cover up your own fraud by saying that it's being, everything's being sold as is and so on, which is what this thing said. Okay, well, so perhaps reasonable minds may differ on whether it's a particularly effective argument, whether it's, you know, but it was, again, as the government acknowledges, the argument that they had and it was, at least as the government describes it, their best argument. And it's not a bad argument. I'm not backing away from that argument. If the court feels differently, I respectfully disagree. But the point is, that was the argument that they made and that was the precise argument that the government was responding to. It's not fair and it's not accurate for the government to say that these instances of misconduct were quote, few and far between. The rebuttal closing is 24 pages long. It starts on page into it. The government is already talking about... What were the four? There's the thing about the contractors, the thing about the gangs. What else? There was a lulling. Why didn't they go to the, why didn't he admit what was, what was wrong? Because then they would have gone to the FBI. It's called lulling. It happens in every fraud case. So that's 5904. By 5911, the government is talking about, when I was trained as a prosecutor, they told us to draw a line down the page. And then he said, what were his reactions and his view of the evidence were? Now that standing alone might not be so severe, but in the overall context of the sort of... Okay. You're about out of time. All right. We'll give it a couple minutes to rebuttal. Very good. Ms. Farantino, is there anything you want to say? I mean, I don't have any questions, but. So my understanding is you weren't going to argue unless we have questions, and I don't have any questions. No. We don't have any questions. Yes, Your Honor, may it please the court. I just want to make clear that we are joining in the other arguments by Mr. Schultz's attorney, Mr. Bernstein. And then if there's any questions on this deficiency, we'll submit on that. Thank you. May it please the court. Greg Staples for the United States. I want to address briefly the waiver argument. Just, I think we've made it clear in our papers, but they all have waived. But does this mean waiver that there's no review period, or does this mean plain error, or what exactly? As I understand it, it's waiver in the sense that they've waived it unless they meet certain conditions such as... My question is, does that mean we don't get to review it, or does that mean it's plain error? That's my understanding. Why? So how is it a waiver? I mean, a waiver is something where somebody voluntarily waives a known right. In other words, I get up and I say, I'm not challenging the denial of the severance. How is the, this is an implied, it's more of a forfeiture, isn't it, that they didn't raise it at the appropriate time? Yes. So why isn't that plain error review? I mean, whether it makes a difference or not is another question, but... Then it would be. Okay. Also, it does strike me that the severance issue is the worst possible example of why to be tough on the 50A question, because there's basically nothing the judge could have done at that point except retry the case. In other words, in many instances when you're, when you insist on having a 50A motion, it's because you might have been able to reopen the evidence and fix it, or you might have been able to give instructions that would fix it, or some might fix it. But in this instance, there's nothing you can do but retry the whole case, right? If you decided that it was a problem. So what is the function of making people stand up and say this thing that is really of no use to me in the case is, number one, you want to avoid gamemanship. I'm sorry, what? You want to avoid gamesmanship. Well, what does that mean? It's only gamesmanship if you're preventing something from happening that would be useful to happen. But in this instance, whether you retry the case before it goes to the jury or retry it after you go to the jury, you're still retrying the case. My reading of this Court's opinions say that the reason for this requirement to renew by the close of evidence is to prevent defendants from withholding an otherwise meritorious motion to see how the jury rules. Okay. Well, maybe it's better if they do, because if they have to make a motion anyway, then he just has to rule it twice, and it's a waste of time. I mean, it doesn't make sense to me. It makes sense to me in almost every other circumstance. But when you're talking about something as global as the severance question and the case is now over, it's not the middle of the trial, you're not going to save any time at all. What is the point of it? I actually share your frustration, and it on the face doesn't make immediate sense. What I would say in this case, though, and why I think they absolutely have waived it, is this judge, and I believe you cited it earlier, went out of his way when he denied the motions to say, I'm emphasizing this is without prejudice, basically urging him, bring it forward as it comes forward. Say, not the end of the case, but what about raising it while all of this purported finger-pointing was going on? I mean, I would... That would have somewhat more function. Object to the evidence when it's coming in. I object, I ask for a limiting instruction, something like that. Ask for a limiting instruction or renew for severance if it's really that bad while it's going on. So in the post-trial motions, when the defendants argued in the post-trial motions that there should have been a new trial because it should be a new trial because there wasn't a severance, did you argue this waiver in response to that? To be honest with you, I don't recall. Yeah, I honestly, I didn't. I should have looked before and I didn't. Here's the thing I find interesting, though. The judge, when he rules on the post-trial motions, doesn't say, gee, why didn't you come back here? You forfeited the point. You didn't, you waived it, whatever. He rules on it on the merits. So one of the exceptions to this waiver issue is futility. Isn't that a pretty good difference? The fact that he ruled on it on the merits after trial without relying on the failure to re-raise the point later on? I think there's sense to that, but the issue I'm having is that would almost seem to apply in every case. I mean, if a judge . . . I can certainly imagine saying in myself, ruling on a post-trial motion, where the heck were you? I would have been able to do something about this. You forfeited the point. And then maybe go on to rule on the merits too to say, gee, the judge didn't really do the first step here. He just skipped right to the merits. Yes. Okay. So maybe you should do the same. Go to the merits. Yes, I will. The cases, as I read them, are very clear that simply pointing the finger at one another at trial is not enough to get severance. There has to be something more in the line of denial of the basic trial rights, such as the right to confrontation, the right to present an individual defense. The cases that the defendants rely upon, Sherlock, Mayfield, and Tutick, are easily distinguishable from this case. In Sherlock and Mayfield, those cases involved brutal errors. I'm sorry, what? Brutal errors in that they claimed they were improperly joined, but on top of it, errors occurred during the trial where statements by their co-defendants that were given to law enforcement officers that inculcated both defendants were allowed in. And in that situation, the defendant obviously could not cross his co-defendant. In addition, I believe in both Sherlock and Mayfield, other statements came in, such as statements by an informant to an officer and who provided facts for an affidavit for the arrest warrant, which pointed the finger I don't remember any of that in Tutick. I thought it was just That's not Tutick. I don't remember any of that happening in Tutick. I thought in Tutick it was simply that they were pointing at each other. And in this instance, it really was fair. I mean, as I said before, I thought your description in the briefs was accurate as to the opening statements, but it greatly deteriorated after that in terms of who to the point where they, by the time of the closing argument, they were still fraud. It was all these two other people. But then they had each of them had a second argument, which was it was that other guy who is a liar and a cheat and he did me in and if it wasn't for him, I wouldn't be here. And it was fairly extreme, don't you think? No. I don't think it was extreme in the context of this trial. I think it's an important distinction that they didn't just point the finger at one another as in Tutick. They began their closing arguments by saying either nobody committed any fraud or if it was That was one point. But the second point was, I mean, even if there was, he's a liar and a cheat. Well, the second point was, if there was a fraud, it was Sheridan Snyder, the crooked escrow agent and the crooked property manager who took money and didn't do what they were supposed to do. Both sides made that argument. So are you saying that it only is material or significant, the inconsistency? In other words, if that's the only argument they make in closing argument. In other words, if they have some other basis. Correct. Correct. Because the jury could have accepted any one of these arguments. They could have accepted that Mr. Hamor relied in good faith on property valuations he had and therefore had no intent to defraud. They could have accepted that, yeah, Sheridan Snyder was the real problem. And in fact, she was. I said it was the real source of the whole problem in a sense that she was the escrow officer. If she had simply done her job and held that money till people either got their properties or didn't, this case never would have been brought. She pled guilty. But I thought, actually, one of my reactions to reading was that one place where it seemed very important that they were at odds with each other was as to Snyder, was that her name? Credibility. Because one of them was basically assuming that she was credible, I think Schultz, and saying, you know, so she was the whole cause. But the other was essentially saying she's a liar. She said, when she said, I told her to do this and I told her to do that, she's lying. So she was really the fulcrum of everything and they are directly at odds as to whether to believe her or not. Yes, they were. So why isn't that the fact from Mr. Hamor and his colleagues, whose name I'm not remembering, Lucchesi's point of view, the fact that the co-defendant was vouching for her credibility while he was attacking it, a problem in itself. In other words, he had not only the prosecutor vouching for her, but he had two or three of the defendants vouching for her. And he is saying, but she's a complete liar. Because if she's not a complete liar, in the sense that she said, he's the one who told me to release this money and he's the one who, and he understood that I wasn't supposed to be doing this, essentially. Everything turns for them on her credibility, or a great deal turns on her credibility. I'd say a good deal does. I think there's other strong evidence against Hamor and Lucchesi. But my response is that that was certainly prejudicial to them, to the Hamor and Lucchesi group. But I don't believe it was error, in the sense that it didn't involve a fundamental trial right, such as the right to confront a witness or to present an individual defense. I mean, it was simply the give and take of trial. The problem I have with a lot of what they point out in their brief as these examples of second and third prosecutors is, I don't see something along the lines of them introducing, say a prudent error type statement or something like that. I mean, when you look at what they're talking about, it's essentially cumulative of what the government was already doing with its witnesses. Well, he had a set of examples, which I didn't write down, which he claimed were not cumulative. Maybe the government could have found them separately in a separate trial, but it didn't in this instance. It was not introduced by the government. It was introduced by the co-defendants. It was a little bit of an odd argument today because we had Mr. Schultz's lawyer arguing, so it was more focused on Schultz, even though it seems to me the prejudice was more to Hamor than to Schultz. But again, to the point of this battle over the credibility of Snyder, I don't think it's enough to warrant separate trials. I don't see in anything they suggest that there was a case similar to this in which there was this much finger-pointing and antagonism and substantive backing up of the government. In a case where I would say, you know, you may think it was a very strong case, but I don't know that it was a very strong case. It was, you know, there were arguments on the other side. Is there any example? I'm trying to recall the facts of Sullivan, but I can't answer your question now. I'd just be wasting your time. I couldn't quite find one. It seemed fairly extreme to me, frankly. Complicated. Complicated. Because it's not just, you know, he did it or I did it, but vigorous. As time went on, not at the outset. And I guess to bolster my argument, I would also point out that in addition to the I'm not seeing a violation of a fundamental trial right, there is finger-pointing, but the cases seem to say that's insufficient. I'm sorry, I'll let you finish. I have a question about fundamental trial right, though. The court did instruct the jury about separate charges, separate defendants, statements of evidence, and in my view, something they don't address much in their briefs is we got separate verdicts, selective verdicts. As I read the cases, that's Well, only as to the peripheral people, though. Well, that's how they characterize it. I don't consider them peripheral at all. I mean, if you look at the record, Mr. Wardeen got as much money or more than Mr. Schultz did. He owned the company that was to take title from the Haymore defendants in the properties and deliver them to the victims in this case. And tellingly, Wardeen was on the phone in early 2010 with investors at separate times telling existing victims the property is trash and the money is gone. It's all out of escrow. The same time he's doing that, he's still working with Schultz in their offices in Costa Rica, conducting new seminars and bringing in more money and new people. But as to where the attacks were going and where the importance, for example, of Snyder's testimony, it seemed to me that he was peripheral in the sense that he may have been very important, but he wasn't really participating in this back and forth, which was largely between Haymore and Schultz. There's no question about that. But I think, and I'm sure you'll tell me if I'm wrong, but as I read the cases, they talk about the ability of the jury to collate evidence as to each defendant. And I — what I mean by that is I don't read that to mean it has to be to the specific complaining defendants. In other words, the jury — Well, yes, but you have to start with what was the problem and then say despite the problem did they — were they able to break down the charges. And if the problem didn't involve Mr. Warden or — I think that's his name — then it doesn't matter whether they could separate him out. In other words, who was being the subject of the cross-attacks? Not him. So therefore, we don't have to ask the question of whether the cross-attacks prejudiced him because he wasn't involved in the problem very much. No, but — and I'm probably fighting uphill on this, but it shows, I believe, that the jurors followed the court's instructions to consider the evidence separately for each defendant. And in fact, they acquitted Sylvia Malkonian on four of seven charges. I guess what I don't see is anything other than a supposition that, well, because these guys were all convicted on all their counts, the jury must have done something differently than they did with these other defendants in terms of their jury deliberations. And I don't see a basis for saying that. So can I ask a question about this? So you use the phrase — and it's in the briefs, too — you know, it has to be a prejudice or it has to be a deprivation of a quote-unquote judicial opinions. What's it mean? I mean, has anybody ever said, okay, here's the trial rights that are fundamental and here's the ones that aren't? Because I always kind of thought having a fair trial was sort of fundamental. I agree. And again, I'm going off the opinions I've read. There are examples given. Bruton, obvious. That's an obvious one. I mean, I get that. But there's places we can look. If it's represented in individual defense, conflicts if multiple defendants are represented by one lawyer. If I could take a minute and find it, but there are cases we cited in our brief that discuss that. But basically, your point, though, is that just having a fair trial doesn't qualify as that. That's really the argument here. We didn't have a fair trial because we were having to fight a multiple front war. That is what I'm saying. And I'm getting that from the opinions that I've read because they clearly state that to qualify for severance, you have to show this extremely manifest prejudice to your right to a fair trial. And also, you have to show a deprivation of a fundamental trial right. That's cited in our brief. I don't have the name at the top of my head at the moment. So, I think with the instructions given by the court, the separate verdicts, and I accept and understand the argument. The instructions were, and this may be a product of the fact that it wasn't raised at the end of trial, but they were in no way specific. I mean, they could have said, but nobody asked them to, and that may be the reason why they didn't. There was a lot of cross-finger pointing going on here, but you should not pay any attention to what they're saying about each other, and so on. No such thing was said, but no such thing was asked for. Correct. You would have objected to that instruction, right? Pardon me? You would have objected to that instruction if they had asked for it, right? Honestly, I don't know that I would. I want to move, while I still have time, to the misconduct allegations. I'm sorry? To the misconduct allegations, and provide you with an update. As to the statement I made about there's contracts in every fraud case I've ever done, I concede that's error. It was not, we did not concede it in our brief, and the reason I can tell you is, as you may know, we have various levels of supervisory review. The time the brief was submitted, we didn't think it was error, but since that time, I've had discussions with my appellate section, and we agree it's error. We don't believe that it's error that requires any remedy, because it was an isolated statement. It was couched in an otherwise, we believe, proper argument about how you can't simply lie to people orally, and then write down something different on paper, and use that as an excuse to escape liability. You know, I wondered about that, because in civil cases, it happens all the time. Somebody comes in and says, well, he told me X, and you say, well, that's nice, but you agreed to Y. That's an interesting point. And, you know, there have been times I've done that and thought, well, this isn't really very fair, but that seems to be, occasionally not, but usually that's the rule. Yes. Well, in any event, I want to take a look at all of them. The first one, they objected to was my comment about lulling happening in every case. That was directed against Mr. Wardeen, who was acquitted. And I would suggest from that that the jury was not hanging on my every word, or that somehow the prestige of my office was improperly swaying them. The comment about the gang membership, I don't believe it was error. Looking back with hindsight, it was probably a stupid thing to say, but it was clear that I was trying to make an analogy that simply following orders doesn't get you off the hook when you know the orders are corrupt or bad. And this wasn't the type of case where anyone in the jury was going to think that these were actual gang members. They were very far from being gang members. Well, he characterized his argument as not being, I was following orders, but that I was following the representation that what I was saying was true. Right. I should clarify the following orders applied to Sylvia Malkonian. That was the argument her lawyer made, that she was simply following orders that Mr. Schultz gave her. And then finally, the statement about beyond reasonable doubt, I frankly don't understand that. I summarized the jury instruction accurately. The comment about the gang membership, I thought, jurors every day in this country apply that burden to reach decisions. Okay, maybe I shouldn't have said that, but even in hindsight, it's like, does anyone really doubt that? And does it prejudice the jury? And again, all of these statements were in response to comments made by defense counsel. And I agree what I said about the contracts was error, and I should not have done that. But I believe the cases are pretty clear that courts will take into consideration the context, including statements made by defense counsel. We were supposed to have an argument about the sentence, the guidelines, but we actually never had such an, no one ever made the argument. So we gave them five minutes, 10 minutes extra to make. I'm happy to let them do that now. So I don't know if there's anything you want to say about it. Sure. The sentencing for Defendant Schultz... It seemed to me that the, what was it, about a million four for Haymore and Lucazio wasn't explained very well, to put it mildly. I don't know where it came from. I'm not saying there was an obligation to explain, but it's somewhat impossible to figure out where it came from. Yes, I could not tell you. I will tell you this. We had a financial person from the State Department of Justice who testified at trial, and we presented a declaration from her setting forth what we believe the loss to be. The loss for all defendants and then the loss just for Wardeen Schultz and Melkonian after the two dropped out. I gather that ultimately, and I don't know why, that whole bunch of money dropped out. Pardon me? The money after 2010 dropped out. The amount that was judged against Schultz did not include the 2010 money. I believe that it did. Well, if it did, then why isn't his argument, basic argument, correct? Which is that if Schultz has $2 million and includes the 2010 money, then how could he have 1.4? The... I'm not sure I can answer that question. I'm not sure I can answer that question. I'm not sure I understood your question because... Well, I understood his argument to be, Haymore and Mukasey's argument to be, that you start with the $2 million that was adjudged against Schultz. Right. If you back out everything that happened in 2010, theirs has to be less than 1.4. That's what I understand their argument to be. Right. I don't have a good answer for that. Right. Other than, I do understand what the calculus was that Judge Guilford was dealing with. He didn't accept the government's number of, let's say it was $4 million because he, I don't think, was impressed by the trial testimony of this case. What complicates it is they're saying, you need to reduce this because some people, not many, but some people did get properties. And to that end, they tried to offer Zillow printouts to say, look, this is what it was worth at the time, which we argued very strongly was completely unreliable. And they were arguing that some people got rent payments back, the with sending this back to say it needs to be clear, more clear, is I don't know how to do that without conducting a whole nother trial simply on the issue of loss. When we know how much money came in, most people got nothing or they got properties that cost them more to get rid of. Some people did get a few properties, but are we going to go through that? But the question is the relationship between the two numbers. I mean, that seems to me to be a fair question. Since you didn't explain the 1.4 and since the relationship between the two numbers doesn't seem to make a lot of sense, should we at least ask him where he got the 1.4 from? In other words, the non-explanation itself wouldn't be enough, but the non-explanation in light of what appears to be an anomaly might be enough. I agree. I candidly cannot tell you anything more about the particulars of those two numbers. As to Mr. Schultz and his appeal of the role enhancement, I believe that should be affirmed. There was a comment in the reply brief that the application notes for that enhancement were not addressed by the court. However, they're in the PSR at paragraphs 80 and 82. There's the recitation of the factors and then probation's assessment of the facts based on those factors. And the court did say to adopt the factual findings of the PSR, so I would argue that there was, in fact, at least an implied finding by the court as to those factors. The only other issue, other than the loss for Hamor, is the burden of proof. And I think the cases we cited are very clear. It's a preponderance of evidence for convicted conduct. Likewise, in wire fraud cases, we cited several cases in our brief that say that. So with the exception of the mystery of the loss amount, I believe we're otherwise on solid ground on the sentencing issues. I have 25 seconds left if there are any other questions. Okay. You're welcome to give them up. I will give them up. Thank you very much. Thank you, Your Honors. I do want to address the Schultz sentencing argument, but just to answer three specific questions on severance directly, it does not need to be a case of a, severance is not required, does not need to show a specific trial right. Zaffiro from the Supreme Court specifically says that, to quote, a defendant should, a district court should grant severance under Rule 15 if there is a serious risk that the joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. In other words, would it affect the general fight to a fair trial? This Court's decision in Mayfield adopts that exact understanding. I mean, the problem is that, I mean, it may be more reliable. I mean, maybe the fact that each of them was pointing out their problems in each other's case made the trial more reliable. It isn't a question of, I mean, we had a case recently in which there was a severance question having to do with the damages and the liability, and we reversed it for, because a lot of the evidence that came in, in the joint trial with regard, wouldn't have been admissible in liability. So there was prejudice. But the fact that they're each attacking each other, if what they're attacking each other about is not itself illegitimate evidence, it's just that the government didn't have it or the government didn't use it. Why does that make it more difficult to separate out the defenses? I mean, that's, respectfully, Your Honor, that's completely counter to the government's burden of proof. And the idea that, I mean, what Your Honor is essentially positive. So, all right. So now you're getting specific here. So your argument is that the government itself should carry its burden of proof. Absolutely. And that's the – Not with somebody else helping. That's the Zaffaro concurrence. It makes that exact point, as does Tutick and Mayfield and Romanello, which is, addresses another – But that's much more helpful than saying that it was going to interfere with the determination of each person's culpability, because it might not do that, but it still might not follow our rules about what's a fair trial, i.e., the prosecutor is supposed to prosecute and prove it. Exactly. And that's the concurrent – I'd point the Court to the concurrence in Zaffaro. Another specific question was what about alternative arguments. And Romanello case addresses that. And they say, to be sure, there was a theoretical possibility that the jury might acquit all the defendants under alternative theories. But the real question for the Court is, in considering a severance motion, is not how convincing the defendant's evidence is, but whether the core of his defense directly implicates the co-defendant. And here we see the cores do directly implicate each other. So the government's alternative argument has been rejected, at least in the Romanello case, and we would suggest also in Mayfield and Tutick. Finally, Judge Kennelly, you asked, did you raise – you asked my colleague, did you raise this in your – The waiver thing in his response to the court. He did not. He did not. Okay. Turning to the sentencing, just to be clear, and I don't think that the Court thinks this, but just to be clear, this one-level swing, this is not some kind of throwaway argument. I asked the Court for additional time because we feel very strongly that this was error, both in terms of the procedure and the substance. Mr. Schultz, my colleague, my friend, describes him as a manager. He says in his brief he brought the two halves of the side together. Let's just accept that. That makes you a middleman. If you bring the two halves together, that makes you a middleman. Well, it depends what you do after that. But that is what the managerial role is – decide is supposed to effectuate, not the leadership enhancement. And what the government says about the PSR adopting the factual basis in the PSR, it's – respectfully, it's not accurate, and it's not accurate in two respects. If the Court looks at the PSR, it will see that the PSR focuses almost on a minor role analysis, because that's what they're used to, and talks about relative culpability and says, well, we think Schultz is the most culpable, therefore he gets the director leader. That's not what happens in aggravated role. You're not supposed to look – it's not the same as minor role, the mirror image. You're not supposed to look at just relative culpability. You're supposed to look at other things – the nature of the participation in defense, the recruitment of accomplices, the degree of participation in planning, the share of the – the lion's share of the funds, the nature of scope of a legal activity, and the degree in control exercised over others. Mr. Schultz can't be the only one and then be the leader. He exercised – that's the key. If you're a leader, you're at the top. You exercise control over everyone down below you. Here, he only exercised control – So you're saying there can only be one leader? No. There could be – you could have a CEO and a CFO and a COO. Or in a drug conspiracy, you could have a lot of leaders. Right. It's not just a kingpin, but you – but there is a distinction, a material distinction between a manager. And one other thing is, who does he control? At most, he controls Malkonian. What about the scope? Well, the government says it itself at ER 1033. This is a very simple case. It involves one scheme to defraud, a simple case, one scheme. Schultz did the selling. It's that simple. What about the larger share of the profits? Well, it's – Schultz gets $335,000. That's not the lion's share. It's a managerial share, arguably, but it's not the lion's share. Then there's somebody else who got more. Well, our position is that, yes, Haymor, Lacossie, and likely Wardeen got more. Each. I don't mean all together. That would do the math. Yeah, or at least that Haymor, that Florida camp, yeah, they would get – or the Wardeen camp. Well, it's two different things, though. I mean, in other words, in other words, are you saying that Schultz got more – Schultz didn't get more than any other single person, or that if you compare Schultz to the Florida group, then they got more than he did? I don't think he got more than any other single person. Okay. Then decision-making authority. He's got no authority over Wardeen. That's the first – I've gone in reverse order. That's the first category that the costs consider. The exercise of decision-making authority. He's got no authority over Wardeen, no authority over Haymor, no authority over Lacossie. Laconian, though. But that makes him a manager. That's exactly the difference between a manager and a leader or organizer. We're saying that it was – it should have been at most the three-level, not the four-level. And in this case, it's not harmless. It's not harmless because he got, at level 29, he got a 29, the range was 87 to 108. He got 90 months. So he got three months above the low end. Aren't there cases that say that you only have to exercise decision-making authority over one other? To qualify for any aggravated role enhancement. It's a condition precedent for any aggravated role enhancement. But not – it doesn't specifically say – Okay. Where you go in the chain. Where you go in the chain. Correct, Your Honor. So at level 28, which is what we're saying he should have been at most, the range is 78 to 90 months. If you take those three months from the low end, you get 81 months, which is a nine-month swing. Nine months in jail is a long time. Okay. Thank you very much. Thank you for giving me extra time. Thank you all for your helpful argument in this complicated and interesting case, the case of United States v. Schultz.
judges: Tashima, Berzon, Kennelly